J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
Camrie Ventry (SBN 355853)
cventry@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 1100
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Dana Hughes*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA HUGHES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>DRAFTKINGS INC., a Nevada corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:26-cv-06768<br><br>**CLASS ACTION COMPLAINT FOR (1) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51); (2) INTRUSION UPON SECLUSION** |

CLASS ACTION COMPLAINT

**INTRODUCTION**

1.      Plaintiff, on her behalf and on behalf of a class of similarly situated persons, brings this action against Defendant DraftKings Inc. ("DraftKings" or "Defendant").  DraftKings operates a website, located at www.draftkings.com (the "Website"), that offers online sports betting, and the opportunity to compete in online fantasy sports competitions for a fee, to the public.

2.      Defendant has installed and deployed data broker software on the Website to secretly collect data about visitors, their devices, locations and views of webpages to identify who they are, target them with unwanted marketing and track their internet browsing on an ongoing basis.

3.      The data broker software compiles the collected data and correlates it with extensive external records it already has about most Californians in order to learn the identity of Website visitors.

4.      Both Defendant and the data broker behind the software deployed by the Website benefit commercially and financially from this activity. That is because collected and transmitted visitor data, as well as the identification of specific visitors using that data, are performed with the purpose of targeting Website visitors for specific marketing, among other things. The data brokers benefit because they use the data to compile a more comprehensive profile of visitors, or they can sell the data/profiles for advertising and other purposes.

5.      Defendant's installation and use of data broker software without obtaining consent or authorization therefore violated California Penal Code § 638.51, California's Trap and Trace Law and duties Defendant owed to Plaintiff and other visitors to the Website similarly situated under applicable common law.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the

CLASS ACTION COMPLAINT

proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

7.    Defendant DraftKings is a Nevada corporation that maintains its headquarters in Boston, Massachusetts.

8.    This Court has specific personal jurisdiction over Defendant respecting each of Plaintiff's claims against it. Defendant maintains ongoing commercial relationships with such California customers and residents. Defendant derives substantial revenue from California-based transactions through its operation of the Website. The Website contains content relating to sports teams based in California. Defendant deliberately reaches out to persons browsing the internet from locations in California, availing itself of its opportunity to conduct business in California through the Website.

9.    As described more fully herein, Defendant, through the Website and the data broker software, reaches into the devices of Website visitors located in California, depositing code and cookies onto the browsers and devices of those visitors in connection with the statutory and common law violations alleged by Plaintiff. Defendant intended and understood that such persons would suffer injury in California as a result of the actions underlying Plaintiff's claims, which involve deployment of the data broker software on the Website.

10.   Plaintiff's claims in this action relate directly to Defendant's partnership with NextRoll, Inc. ("NextRoll"), a San Francisco-headquartered data broker whose software Defendant installed, used and uses on the Website. They also relate to Defendant's partnership with data broker The Trade Desk, Inc. ("Trade Desk"), which maintains its headquarters in Ventura, California.

11.   On information and belief, Defendant's partnership with NextRoll is governed by Terms of Service that tie this action to California. Those terms include that California law governs the agreement formed between Defendant and NextRoll

CLASS ACTION COMPLAINT

2

through the Terms of Service. Further, the Terms of Service provide that "any judicial proceeding to resolve claims relating to this Agreement or the Services will be brought in the federal or state courts located in San Francisco County, California" subject to certain arbitration provisions. While Plaintiff's claims are not based on the Terms of Service, they do relate to software and services provided by NextRoll to Defendant.

12. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District.

## PARTIES

13. Plaintiff Dana Hughes ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites.

14. DraftKings is a Nevada corporation that owns and operates the Website.

15. Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's deployment of data broker software on the Website. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

16. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

17.     Defendant owns, operates, and markets its products and services on, the Website.

18.     The Website, like most other websites, due to code or software programs running on the Website, determines the state and sometimes the city in which its visitors are located – between the time a visitor requests to go to the Website (through clicking on a link or typing the Website's address into the browser address bar), and the time the Website loads on her screen.  This location gathering occurs separately and apart from the data broker software running on the Website that forms the basis of Plaintiff's claims in this action.  Therefore, Defendant has at the very least constructive knowledge that the data broker code on the Website that is the subject of this action operated on Plaintiff, and visitors to the Website from California similarly situated, while they were located in California.  Defendant had such knowledge during the time the violations of statutes and common law alleged herein were occurring.

19.     On December 28, 2025, Plaintiff visited the Website.  When she did, data that reasonably likely identified her were transmitted to at least three third parties who used and profited from that data.  This occurred through the operation of software and code on the Website.

**Defendant Shares Visitors' Data with at least three California-Registered Data Brokers**

20.     Defendant has partnered with at least three California-registered data brokers, NextRoll, Trade Desk and Comscore, Inc. ("Comscore") (collectively, the "Data Brokers"), in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors.  Defendant has done this by installing code and tools proprietary to the Data Brokers on the Website.

21.     The code of NextRoll, Trade Desk and Comscore (the "Data Broker Code") deployed on the Website is designed to identify visitors by capturing

CLASS ACTION COMPLAINT

4

electronic impulses transmitted from the devices of visitors to a website on which it is deployed. The process initiated by the Data Broker code identifies visitors through a process called "browser fingerprinting." Fingerprinting allows data brokers like NextRoll, Trade Desk and Comscore to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of tracking cookies installed on their devices, and other traits evident from a user's browser.

## Browser Fingerprinting

22. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings are transmitted to the Data Brokers? One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience. This assumption is incorrect.

23. The fact is that when you visit a website, *and before you get to weigh in on whether you should be targeted with ads or identified*, hundreds of non-personal data points tell those data brokers and social media companies who you are. (These data points are *usually* accompanied by information such as the webpage you were viewing immediately prior to arriving at the website, and your geolocation.) Data brokers may already have access to your name and email addresses, as well as other websites you have visited in the past, to combine and/or match with this incoming data from your device.

24. Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts

CLASS ACTION COMPLAINT

5

- Installed browser plugins or extensions

- Device memory

- CPU class

- Canvas rendering characteristics

- WebGL rendering characteristics

- AudioContext processing characteristics

- Touch support and input capabilities

- Network connection type

25. To be clear, *website operators* require some of the data points at issue to render the contents of a page on a website on their visitors' devices. For example, a webpage will load properly on a visitor's screen only with information about the visitor's device characteristics and configurations, including screen size. What is being discussed here – and what is at issue in this action – is such data being transmitted to ***third parties involved neither with operation of the website itself nor the rendering of the website's contents on visitors' screens.*** Data brokers do not need the data to operate any website, or for any purpose other than to identify, target and track website visitors.

26. As explained in an article in the October 2025 issue of *Wired Magazine*:

Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when

CLASS ACTION COMPLAINT

6

this data is bundled together that your fingerprint becomes unique.[1]

27.   The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a form on a website.[2]

28.   In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[3] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[4]

## The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers

29.   Collection of visitor data by entities such as the Data Brokers – including collection by these entities of unique identifiers that the Data Broker Code assigns to visitors to the websites of advertising companies like DraftKings – enables ongoing tracking of website visitors as they visit new websites in the future.   At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This

---

[1] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 2/22/2026).

[2] As discussed *infra*, in the privacy context, "personal information" can be used to refer to any information that can assist in identifying a person.

[3] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 2/22/2026).

[4] *Id.*

cycle aids the advertising and/or data monetization efforts of the Data Brokers and similar organizations.  The cycle also benefits companies that partner with third-party data collectors to assist with their targeted advertising.

30.    As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

CLASS ACTION COMPLAINT

8

**California Registered Data Brokers**

31. California-registered data brokers, such as NextRoll, Trade Desk and Comscore, are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

32. California-registered data brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

33. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

34. Data brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a data broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:

> "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her

local retailer's shelf. We can also see that [her] income has

not been keeping pace with inflation."[5]

35. Given the amount of data available by way of California registered data brokers' practices, a company like Defendant has an incentive to partner with data brokers so that it can learn the identity of visitors in order to target them with specific marketing materials.

36. Here, Defendant partnered with NextRoll, Trade Desk and Comscore, by installing NextRoll, Trade Desk and Comscore code onto the Website. Defendant allows NextRoll, Trade Desk and Comscore, and possibly other California registered data brokers and social media companies, to access, use, and monetize the data provided by Defendant, in ways that remain undisclosed to the public.

**NextRoll Code**

37. NextRoll is a marketing technology company specializing in retargeting and targeted advertising services. NextRoll appears on the California Data Broker Registry, indicating it trades in the personal data it collects (for example, by assembling audience segments or profiles that are used in advertising). NextRoll's services reach across a vast network of websites and advertising exchanges, and the company openly touts its ability to recognize users across different sites and even across devices for marketing purposes.

38. The NextRoll code on Defendant's Website is a snippet of JavaScript that website owners embed in their site's HTML, typically in the header. Once installed, a feature of the NextRoll Code called the "AdRoll pixel" tracks essentially every action a visitor takes on the site. NextRoll's own help center describes the

---

[5] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users" (Gizmodo.com March 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last viewed 2/22/2026).

AdRoll Pixel as code that "tracks everything your visitors are doing on your site." The NextRoll code functions as follows:

39.    First, when a user loads a page, the NextRoll code executes and sends an HTTP request to NextRoll's servers, including various pieces of information about the visitor's session. According to NextRoll's documentation, the NextRoll code collects HTTP header data - this includes the user's IP address, their browser user agent (which reveals browser version and operating system), the referrer URL (i.e. where they came from), and the current page URL. In addition, the NextRoll code captures site-specific data: it attaches an "advertisable ID" and "pixel ID" to identify the website/ad account in NextRoll's system (so NextRoll knows which client's site the data came from). It then records user actions on the page (what NextRoll calls "Site Activity") such as page views, clicks on certain elements, form submissions, items added to cart, and other conversion events.

40.    Second, NextRoll then assigns each browser a "User identifier" the first time the AdRoll pixel sees that browser.  This is a persistent cookie stored in the user's browser (often named something like "adroll" or "nextroll" cookie) that allows NextRoll to recognize the same user on subsequent visits or on other websites that also have AdRoll/NextRoll tracking.  The NextRoll ID cookie is "persistent" because it enables the tracking of the visitor beyond her visit to the website when the cookie is first installed.  If another unrelated website also uses the NextRoll code, that same cookie ID will be recognized and the user's visit to that unrelated website will be captured as well, and associated with their existing profile.

41.    Third, the NextRoll platform performs "cookie matching," meaning it will compare its own user identifier with identifiers used by other ad platforms in order to broaden the reach of tracking and ad delivery.  For example, if NextRoll's pixel technology finds a user, NextRoll can later synchronize that user's ID with, for example, a Facebook or Google cookie, to continue tracking the user's activity across the internet, storing all of the information collected in a discrete user profile.

CLASS ACTION COMPLAINT

11

42. Plaintiff was subjected to the NextRoll code as described *supra* starting when she requested that the Website load on her device on December 28, 2025.

**Trade Desk Code**

43. Trade Desk is a data broker that collects data to build profiles about individuals without their knowledge or consent in order to sell ads. Trade Desk's technology is so comprehensive that it allows for marketers to push ads to "a specific location, at a given time, in front of a particular Internet user."

44. The Trade Desk software deployed on Defendant's site identifies a user by identifying their device and then matching this information with their database. According to Trade Desk, "[d]evices are identified through unique identifiers stored in cookies provided by device operating systems for advertising purposes, or are generated based on statistical algorithms applied to information about a device, such as the IP address and device type."

45. Simply by visiting a site with Trade Desk software deployed, Trade Desk is able to track user behavior across websites and apps using cookies, device fingerprints, and probabilistic matching. Trade Desk also connects a user's behavior across multiple devices (e.g., mobile, desktop, TV) to a single identity.

46. Trade Desk's business depends on identifying website users without their knowledge. In fact, Trade Desk has stated publicly that their business depends on "ingesting more identifiable information" about individuals. Such information would include information of visitors to Defendant's Website transmitted to Trade Desk due to the deployment of Trade Desk code on the Website.

47. The Trade Desk code deploys tracking cookies that are dropped on visitor's devices to follow users across the web. Cookies are pieces of software code placed by Trade Desk and stored on a user's web browser. Cookies allow Trade Desk to "distinguish between, recognize, and store data about unique web browsers and devices, and to store data on [Trade Desk's] servers[.]". The cookies further allow Trade Desk to "recognize web browsers across sites and over time, and

therefore to record information about them over time." Trade Desk cookies store and cause the transmission of a unique identifier that enables Trade Desk (and other entities with access to the cookies) to track users as they navigate a website, and any subsequent website where the cookies appear.

48. Plaintiff was subjected to the Trade Desk code as described *supra* starting when she requested that the Website load on her device on December 28, 2025.

### Comscore Code

49. Comscore is a data broker that monitors individual users across sites via unique IDs and captures their real-time browsing metadata (IP, pages, timestamps) for analysis.

50. The Comscore code functions as follows: First, when a user visits a tagged site, the Comscore code triggers an HTTP request to Comscore's servers. This request transmits identifying signals in real time - including the user's IP address, a timestamp, and browser type.

51. Second, the Comscore code sets a unique cookie in the user's browser upon first contact, which enables recognizing that browser on subsequent sites. This allows Comscore to "observe 'browser-level' behavior, i.e. how often you return to a website or if, having visited one website, you go to another related one."

52. Third, the Comscore code intercepts the user's web request and logs it to a third-party server along with persistent identifiers. The data collected (page URLs, titles, visit times, IP, etc.) is used to build user profiles and deduplicate audiences across different websites. In other words, gathered data is correlated with demographic or personal information in Comscore's panel, which Comscore can then sell.

53. The Comscore code thus facilitates continuous, cross-site tracking of users via a unique ID tied to their device.

54. Plaintiff was subjected to the Comscore code as described *supra* starting when she requested that the Website load on her device on December 28, 2025.

**Troubling Implications of Third-Party Data Sharing**

55. Companies using third-party tracking software – such as the Data Broker Code described above – often downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them. However, there is no guarantee that consumer data supplied to data brokers or social media platforms will be used solely for advertising purposes.

56. As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

57. As data brokers, NextRoll, Trade Desk and Comscore can use data they received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies. The same can be said of data they received regarding visits of members of the putative Class in this action.

58.    A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[6]

59.    There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[7]

60.    Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[8]

61.    In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[9]  No clear legal authority exists preventing the sale or dissemination of user data by data brokers to the federal government.

62.    The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for

---

[6] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

[7] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).

[8] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).

[9] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

CLASS ACTION COMPLAINT

15

the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[10]

63.    In early March 2026, a news website reported about the existence of a U.S. Department of Homeland Security internal document revealing that Custom and Border Protection "bought data from the online advertising ecosystem to track peoples' precise movements over time …"[11]

## Data and Related Profiles of Consumers Have Economic Value

64.    The type of visitor data transmitted via the Website to the Data Brokers has economic value – as is obvious from the facts that these third parties create code to collect it, and that Defendant has installed the code on the Website.  The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the Data Broker Code on the Website.

65.    The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website, including Plaintiff and members of the putative Class in this action.  For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[12]

[10] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).
[11] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 3/16/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 3/16/2026).
[12] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 2/23/2026).

66.     As recently explained by the Law Institute:[13]

In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading

---

[13] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 2/23/2026).

of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

67. There exists an established market for the type of personal data collected and transmitted through the Data Broker Code running on the Website: data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

## CLASS ALLEGATIONS

68. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All persons who, while located in California, visited the Website during the applicable limitations period, and were subjected to the operation of the Data Broker Code running on the Website.**

69.    This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

70.    NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

71.    COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

    a.   Whether Defendant's actions violate California common or statutory law;

    b.   Whether Plaintiff and Class members are entitled to statutory damages;

    c.   Whether Plaintiff and Class members are entitled to punitive damages;

    d.   Whether Plaintiff and Class members are entitled to injunctive relief;

    e.   Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

    f.   Whether Plaintiff and Class members are entitled to the disgorgement of profits.

72.    TYPICALITY: Plaintiff was subjected to the NextRoll, Trade Desk and Comscore code running on the Website when she visited the Website on December 28, 2025.  As a result, her data was transmitted to NextRoll, Trade Desk and

Comscore, and possibly other third parties, for fingerprinting, identification and tracking purposes. Her claims are therefore typical of the Class.

73.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

74.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

**Violations of California Trap and Trace Law, Cal. Penal Code § 638.51**

75.    Plaintiff and Class members reallege and incorporate each allegation in all preceding paragraphs contained herein.

76.    The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

77.    A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." § 638. .

78.    Each of the NextRoll, Trade Desk and Comscore code, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

79.     The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

80.     Each of the NextRoll, Trade Desk and Comscore code is designed to identify the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "*sources*" of the electronic communications moving from the devices to the Website are *Plaintiff and the Class members (including their devices)*.

81.     Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device for purposes of §§ 638.50-51. *See, e.g., Biglang-Awa-Castro v. SBE Restaurant Group, LLC*, 25VECV03590, 2026 Cal. Super. LEXIS 25177, at *3-4 (L.A. Co. Super. Ct. Apr. 16, 2026); *Schallert v. RocketGenius*, 25STCV35081, 2026 Cal. Super. LEXIS 25177, at *3-4 (L.A. Co. Super. Ct. March 24, 2026); *Alex & Ani, LLC*, 2026 U.S. Dist. LEXIS 11238, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Lucky Opco LLC*, 25STCV03961, 2026 Cal. Super. LEXIS 24132, at *5-6 (L.A. Co. Super. Ct. Jan. 5, 2026); *Casillas v. Six Flags Ent. Corp.*, 2025 U.S. Dist. LEXIS 260100, at *21-22

(C.D. Cal. Dec. 15, 2025); *Lewis v. Magnite, Inc.*, 2025 U.S. Dist. LEXIS 263675, at *39-42 (C.D. Cal. Dec. 4, 2025); *Santoro v. Lulu & Georgia, Inc.*, 25STCV11722, 2025 Cal. Super. LEXIS 84529, at *8-9 (L.A. Co. Super. Ct. Nov. 21, 2025); *Zhizhi Xu v. Reuters News & Media, Inc.*, 25CV459918, 2025 Cal. Super. LEXIS 76169, at *8-10 (Santa Clara Co. Super Ct. Oct. 24, 2025); *Scarlett v. Future US, LLC*, CGC-25-621912, 2025 Cal. Super. LEXIS 56166, at *11-14 (S.F. Co. Super. Ct. Sept. 5, 2025); *Garon v. Keleops USA, Inc.*, 2025 U.S. Dist. LEXIS 170745, at *10-15 (N.D. Cal. Sep. 2, 2025); *Valenzuela v. Intersystems Corp.*, 2025 Cal. Super. LEXIS 42550, at *3-4 (Orange Co. Superior Ct. Aug. 4, 2025); *Riganian v. LiveRamp Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Price v. Headspace, Inc.*, 2025 Cal. Super. LEXIS 27951, at *3-9 (L.A. Super Ct. Apr. 1, 2025); *Sanchez v. Glasscanopy, Inc.*, 2025 Cal. Super. LEXIS 18460, at *8-9 (L.A. Super. Ct. Feb. 28, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad* Power *Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

82. Defendant did not obtain a court order before using or installing the each of the NextRoll, Trade Desk and Comscore code on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class members before using this technology, which is designed to reasonably likely identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

83.    Defendant obtained neither the express nor implied consent of Plaintiff or Class members to be subjected to the transmission of data about them and their devices to the Data Brokers for the purpose of identifying them as the source of their visits to the Website.  Plaintiff and the Class members never consented to sale of their data by or through the Data Brokers.

84.    Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service."  Defendant is not such a provider.

85.    Defendant's conduct violating § 638.51 caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; Defendant's unauthorized creation of detailed behavioral profiles of them; and the chilling effect on their free online expression and inquiry due to the ongoing tracking of their internet browsing by third parties enabled by Defendant's conduct.

86.    CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.*, 742 F. Supp. 3d at 1077-78.

87.    Plaintiff and Class members are entitled to statutory damages of $5,000 for the Defendant's violations of § 638.51.  They are also entitled to injunctive relief enjoining the conduct violating § 638.51.

## SECOND CAUSE OF ACTION

### Intrusion Upon Seclusion

88.    Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

CLASS ACTION COMPLAINT

23

89.    Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

90.    Plaintiff and Class Members maintain a reasonable expectation of privacy in the conduct of their lives, including their internet browsing activities and in their electronic communications and exchange of personal information. The reality of modern life increasingly requires that many of our necessary daily activities be conducted online. Plaintiff and Class members are unable to conduct their lives without engaging in substantial activity on the internet. This fact means that Plaintiff's and Class members' private lives are susceptible to observation and recording that can be used in ways that are comprehensive and highly intrusive – including the creation of profiles capturing their attributes, habits and behavioral patterns. If Plaintiff and Class Members cannot maintain a reasonable expectation of privacy in the conducting of their daily affairs online, and in the digital transmission of their personal information, they can have no such expectation for other facets of their lives.

91.    Defendant's deployment of Data Broker Code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The intrusion allowed the Data Brokers to identify, profile and track (on an ongoing basis) Plaintiff and Class members, and to sell their information.

92.    Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the Data Broker Code on the Website.

93.    Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website.

CLASS ACTION COMPLAINT
24

94. Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Defendant's economic benefit.

95. Deployment of tracking software that engages in the type of identification, profiling and tracking carried out by the Data Broker Code that Defendant installed on the Website forms the basis of an actionable intrusion upon seclusion claim under California law. *See, e.g., Caldwell v. InMobi Pte., Ltd.*, No. 25-cv-09977-AMO, 2026 LX 229530, at \*7-14 (N.D. Cal. Apr. 29, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1029-30 (C.D. Cal. 2025); *Krzyzek v. Openx Techs., Inc.*, No. 25-cv-05588-SI, 2026 LX 42961, at \*10-13 (N.D. Cal. Jan. 27, 2026).

96. The intrusion described herein would be highly offensive to a reasonable person.

97. Defendant's intrusion upon seclusion caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; Defendant's unauthorized creation of detailed behavioral profiles of them; and the chilling effect on their free online expression and inquiry due to the ongoing tracking of their internet browsing by third parties enabled by Defendant's conduct.

98. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the Data Broker Code on the Website was malicious, oppressive and willful.

99. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

**PRAYER**

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendant:

1.     An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;

2.     An award of statutory damages pursuant to CIPA;

3.     An award of punitive damages;

4.     An award of nominal damages;

5.     An order for full restitution;

6.     An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

7.     An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

8.     Reasonable attorneys' fees and costs; and

9.     All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: June 22, 2026          TAULER SMITH LLP

By: _____
     J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Dana Hughes*

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a trial by jury.

DATED: June 22, 2026                    TAULER SMITH LLP


By: _____
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Dana Hughes*